Filed 3/29/22  Zilincik v. Tesla CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SCOTT ZILINCIK, et al.,<br>    Plaintiffs and Appellants,<br>v.<br>TESLA, INC.,<br>    Defendant and Appellant. | A154463, A155840<br><br>(San Mateo County<br>Super. Ct. No. CIV 511676) |
| GENE GLAUDELL,<br>    Plaintiff and Appellant,<br>v.<br>TESLA, INC.,<br>    Defendant and Appellant. | A154464, A155819<br><br>(San Mateo County<br>Super. Ct. No. CIV 474656) |

These appeals require us to decide a single question:  when, several years after its founding but before it became practically the household name that it enjoys today, a pioneering automotive startup company called Tesla, Inc. offered stock options to its employees in its standard offer letter of employment, what was the vesting schedule of the stock options? Specifically, could newly hired Tesla employees exercise a portion of their stock options immediately, beginning on the very first day they started working at Tesla, or was there a "cliff" that required them to work for one year before they could start to do so?

1

These two consolidated cases involved 47 former Tesla employees who sought redress for Tesla's allegedly wrongful refusal to allow them to exercise their stock options when their employment ended after less than one year. Following a two-month bench trial in the consolidated cases, the trial court concluded that Tesla employees could immediately exercise 25 percent of their stock options their first day on the job, and it awarded damages accordingly.

Applying ordinary rules of contract interpretation, we conclude the trial court erred in its construction of Tesla's standard offer letter. On de novo review of the undisputed extrinsic evidence, we hold the stock options were subject to a one-year vesting "cliff" that required one year of continued employment before employees could start exercising their stock options. For this reason, we reverse the judgments entered in favor of 18 former Tesla employees who prevailed against Tesla for breach of contract, and we affirm the judgments entered against (or, in some cases, dismiss the appeals by) the 29 other former employees whose same claims were rejected by the trial court on other, unrelated grounds.

## BACKGROUND

Tesla was founded in 2003, by Martin Eberhard and Marc Tarpenning, with the idea of "changing the world" by creating a classy and desirable all-electric car, and the following year, in April 2004, Elon Musk joined the company as the chairman of the company's board of directors (and later became its CEO). The former employees who brought this litigation worked there several years later, during the roughly four-year period from April 2007

2

to March 2011. During this period, Tesla's workforce grew from hundreds to literally thousands of employees.[1]

## A. The Offer Letters

All 47 plaintiffs received Tesla's standard offer letter, identical in material respects. In relevant part, it stated:

"Subject to the approval of Tesla's Board of directors, you will be granted a stock option to purchase an aggregate of [a specified number of] shares of Tesla's Common Stock pursuant to Tesla's Equity Incentive Plan then in effect.[2] *Your stock options will vest commencing upon your first day of employment (1/4th of the shares vest one year after the Vesting Commencement Date and 1/48th of the shares vest monthly thereafter over the next three years). . . .* [¶] . . . You further represent and warrant that you have read, understand, and accept the terms of your Stock Option Agreement, in particular the vesting schedule of the shares of Tesla's Common Stock thereof." (Italics added.)

The italicized language, at issue here, was added by Tesla's then head of human resources (Craig Harding) around February 2007, who added the language (without consulting either his superiors or the company's board of directors), because he thought the prior version was not sufficiently clear as

---

[1] The parties' briefs do not specify the figures, but Tesla asserted in closing argument the evidence demonstrated it grew from around 150 employees in 2007 to more than 5000 by 2012. That rise was not without setbacks; the trial court found that in October 2008, it laid off 25 percent of its workforce, dropping from approximately 225 employees to 189. And in 2010, in anticipation of its upcoming initial public offering, it laid off 30 percent of its national salesforce.

[2] The terms of Tesla's equity incentive plan, which it revised in 2010 after its initial public offering, will be discussed as necessary in our analysis.

3

to when employee stock options would vest.[3]  Harding testified he had been informed by someone "in company management" that Tesla's practice was to vest 25 percent of someone's stock options after one year and the remaining portion monthly over three years.  Tesla used the revised version of the offer letter for about five years, until sometime in 2012.

None of the plaintiffs received any attachments or any of the documents referenced in their offer letter when they signed it (i.e., the Stock Option Agreement and Equity Incentive Plan); Tesla's standard practice was to provide such documents only after an employee started work.

After they started work, most of the plaintiffs received a standardized grant notice advising them that the board of directors had approved their award of stock options, and all parties agree the grant notice stated that the options were subject to a one-year vesting cliff.[4]  It is not entirely clear how many plaintiffs received that document, but the parties agree in their briefing that at least 30 of them not only received that document but also

---

[3]  That prior version, in effect from 2003 until sometime in early 2007, stated:  "Your stock options will vest in accordance with the Tesla Motors Equity Incentive Plan of 2003 commencing upon your first day of employment."

[4]  Specifically, the grant notice specified that the "exercise schedule" for the stock option was the "same" as its "vesting schedule":  "1/4th of the shares vest one year after the Vesting Commencement Date.  1/48th of the shares vest monthly thereafter over the next three years."

4

*signed it* (plaintiffs say 30 did so and Tesla says 32, but the precise figure is immaterial).[5]  The record shows that others also received it.[6]

Some plaintiffs also received a Stock Option Agreement, which was often included as separate document with the grant notice, and plaintiffs concede in their briefing that at least 18 of them signed that document.  The Stock Option Agreement incorporated the terms of the grant notice, stating that "[s]ubject to the limitations contained herein, your option will vest as provided in your Grant Notice, provided that vesting will cease upon the termination of your Continuous Service."

The trial court found that some plaintiffs did not receive either a grant notice or a stock option agreement while employed at Tesla, but the court did not specify how many plaintiffs fell into this category, nor have the parties in their briefing.  But it appears that, at most, 11 plaintiffs received neither document, although again the precise number is immaterial.[7]

---

[5]  It is appropriate for us to rely on the parties' factual assertions in this way.  Because appellate briefs and arguments "are 'reliable indications of a party's position on the facts as well as the law,' " appellate courts " 'may use statements in them as admissions against the party,' " and " '[a]n express . . . assertion in a brief is frequently treated as an admission of a legal or factual point, controlling in the disposition of the case.' "  (*Lueras v. BAC Home Loans Servicing, LP* (2013) 221 Cal.App.4th 49, 93 (*Lueras*) (conc. & dis. opn. of Thompson, J.).)  Particularly given the size of this record, we will do so here as appropriate and necessary.

[6]  By way of example, the trial court specifically found one plaintiff, Patrick Nemeth, received the grant notice but did not sign it; and another, Guillermo Berzunza, received a grant notice but it was "questionable" whether he signed it (because his copy was unsigned and Tesla produced no signed copy).

[7]  Below in closing argument, plaintiffs' counsel asserted that 11 plaintiffs never received either document, thereby tacitly conceding that at least the other 36 *did* receive one or both.  (See *Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 752

In 2010, following its initial public offering on June 29, 2010, Tesla combined the Stock Option Agreement and Grant Notice into a revised, consolidated agreement called the 2010 Stock Option Award Agreement, which applied to three plaintiffs who were hired in that period and signed the revised document. Like the earlier documents it replaced, the Stock Option Award Agreement also described a vesting schedule that included a one-year vesting cliff.

## B. This Litigation

In July 2008, David Vespremi, a former employee who had been terminated shortly before his 12-month anniversary, brought suit against Tesla, seeking damages and other relief based upon the stock option provision of his offer letter (*Vespremi v. Tesla Motors, Inc.* (Super. Ct. San Mateo County, No. 474656). Another former employee, Gene Glaudell, joined the litigation, and their complaint was eventually narrowed to allege a single cause of action for breach of contract, based upon the vesting language of the offer letter.

The *Vespremi* pleadings were settled after an appeal to this court. Reversing an order sustaining a demurrer without leave to amend to the breach of contract cause of action, we held the vesting language of the offer letter was ambiguous and thus its meaning could not be resolved at the demurrer stage (*Vespremi v. Tesla Motors, Inc.* (May 5, 2011, A127008) [nonpub. opn.] [2011 WL 1713497] (*Vespremi I*)). We discuss that opinion in greater detail below.

[unambiguous concession in closing argument that is "not made improvidently or unguardedly" is a binding judicial admission]; accord, *Korchemny v. Piterman* (2021) 68 Cal.App.5th 1032, 1049.) Tesla says that only 12 plaintiffs *signed* neither document.

6

In 2013, the claims by the lead plaintiff, David Vespremi, proceeded to a bench trial ahead of Glaudell's claims. Vespremi prevailed, but on appeal we reversed the judgment entered against Tesla, and Vespremi's claims are not at issue here. (See *Vespremi v. Tesla Motors, Inc.* (Oct. 30, 2017, A142391, A143550) [nonpub. opn.].)

Meanwhile, on February 7, 2012, another former Tesla employee, Scott Zilincik, commenced a separate lawsuit against Tesla while the *Vespremi* case was underway (*Zilincik v. Tesla Motors, Inc.* (Super. Ct. San Mateo County, No. 511676). *Zilincik* was brought on behalf of all similarly situated former Tesla employees whose employment had ended before one year, alleging Tesla had breached the stock option provision in its standard offer letter by denying those employees "the option to vest stocks of Tesla Motors they were granted during their employment with the company." Class certification was denied, and the complaint eventually was brought on behalf of 47 individual plaintiffs.[8] The breach of contract cause of action in their operative pleading (the sixth amended complaint) alleged Tesla breached "an express written employment agreement" by denying plaintiffs the "option to vest on Tesla Motors' stock options they were granted during their employment" with Tesla.[9]

---

[8] There were originally 51 individual plaintiffs; the parties tacitly agree, though, that the number dropped to 47 by the time of trial.

[9] Also alleged were two nominally separate causes of action concerning their employment agreements: for specific performance of the stock options, and for declaratory relief that, pursuant to their employment agreements, they are entitled to vested stock options beginning the first day of their employment and were not required to work for one full year in order for their stock options to vest.

The *Zilincik* plaintiffs also asserted an alternative claim for "unjust enrichment/restitution," alleging Tesla was unjustly enriched by "fraudulent,

7

The *Zilincik* case proceeded to a two-month, consolidated bench trial together with Glaudell's claims in *Vespremi*, at the conclusion of which the trial court rendered lengthy statements of decision in each case encompassing more than 200 pages combined. In all, 18 plaintiffs prevailed (17 in *Zilincik* plus Glaudell in *Vespremi*); 29 did not.

On the central issue as to the meaning of the ambiguous offer letter, the trial court sided with the plaintiffs. It interpreted the letter to mean that each plaintiff's "right to purchase Tesla common stock at a set price[] vested immediately upon the date that each started working for Tesla." It ruled that "[t]he stock options 'vested' immediately upon employment as stated in the Offer Letter; and 25% of the stock could be purchased through exercise of the options during the first year of employment."

Nonetheless, Tesla prevailed on other grounds against 17 plaintiffs in *Zilincik*. Fourteen plaintiffs lost on the ground they never made any effort to exercise their stock options, 14 others were held to be bound by a broad release of claims against Tesla contained in severance agreements they signed when their employment ended, and one lost on the ground he had been fired for cause.

Subsequently, on May 4, 2018, a judgment was entered in *Zilincik* in favor of 17 plaintiffs against the 29 remaining plaintiffs, and in *Vespremi* a separate judgment was entered in Glaudell's favor. In all, the court entered judgments in favor of 18 former employees, with individual damages awards

---

illegal and inequitable conduct" in that it "promised stock options to each of the Plaintiffs and then it failed to provide those options to them, thus precluding Plaintiffs from exercising their vested stock options and denying Plaintiffs the option to vest on [the] stock options they were granted during their employment." That claim was later dismissed. (See p. 8, *post*.)

ranging from a low of $1,635.83 to a high of $338,528, for a combined total of nearly $700,000. It then denied the prevailing plaintiffs' requests for statutory attorney fees under Labor Code section 218.5 and it taxed costs.

Tesla timely appealed from both judgments, and the plaintiffs timely cross-appealed from both judgments. The parties also appealed from post-judgment orders regarding attorney fees and costs. We subsequently consolidated all appeals.

## DISCUSSION

The parties raise many issues. Many concern liability, most of which pertain to various subsets of plaintiffs; there also are issues concerning the trial court's choice of remedy and its calculation of damages; and the plaintiffs challenge the trial court's denial of their request for statutory penalties and statutory attorney fees.

The one question common to all parties, whether they prevailed below or not, is whether the trial court erred in adopting the plaintiffs' interpretation of the offer letter. As we will explain, it did. For that reason, it is unnecessary to address the parties' other contentions, and the judgments in both cases must be reversed and/or affirmed accordingly.[10]

### I.

### *Appellate Jurisdiction and This Appeal's Scope*

Before turning to the merits, two matters require comment.

---

[10] Relatedly, plaintiffs contend the court erred in denying their motion for leave to amend their complaint to add a cause of action for waiting time penalties under the Labor Code for their unpaid stock options. Because we conclude they had no right to exercise their stock options, any error in denying them leave to amend their complaint is harmless, and we do not understand them to contend otherwise.

9

First, we have independently considered whether the *Zilincik* judgment is final and appealable. We ascertained from the record that the trial court granted an unopposed request by the *Zilincik* plaintiffs to dismiss their second cause of action for unjust enrichment *without* prejudice (at a discovery conference in October 2015, several months before trial). Having assessed the question, we conclude there is no obstacle to our proceeding on the merits. There is no indication in the record the parties agreed to the "without prejudice" dismissal to facilitate potential future litigation on the dismissed claim, or that the *Zilincik* plaintiffs are attempting to reserve their right to litigate that dismissed cause of action in the future. For these reasons, the *Zilincik* judgment is sufficiently final to be appealable.[11] (See *Alaama v. Presbyterian Intercommunity Hospital, Inc.* (2019) 40 Cal.App.5th 55, 63-64; *Alki Partners, LP v. DB Fund Services, LLC* (2016) 4 Cal.App.5th 574, 589, fn. 6; *Abatti v. Imperial Irrigation District* (2012) 205 Cal.App.4th 650, 665-666, approved by *Kurwa v. Kislinger* (2013) 57 Cal.4th 1097, 1105-1106.)

Second, there is an issue concerning the identity of the appealing parties. Tesla asserts that only 19 of 29 losing plaintiffs have appealed but

---

[11] No party's briefing mentions the "without prejudice" aspect of the dismissal or addresses its impact on the finality of the subsequently entered *Zilincik* judgment. Moreover, the parties did not comply with their mandatory duty (as appellants) to address the finality of the judgment and assure us that it is indeed final and appealable. (See Cal. Rules of Court, rule 8.204(a)(2)(B) [appellant's opening brief must "state that the judgment appealed from is final, or explain why the order appealed from is appealable"].) Their briefing "simply serves the question of appealability onto the court's side of the net and invites the court to undertake an independent analysis of appealability." (*Lester v. Lennane* (2000) 84 Cal.App.4th 536, 557.) Particularly given the size and complexity of this voluminous set of consolidated appeals, the omission imposed an unnecessary burden on the court.

provides no record citation.  The notice of cross-appeal from the judgment entered in *Zilincik* was filed by "Plaintiffs Scott Zilincik, et al.," which we construe to mean all plaintiffs in that case.  Nevertheless, Tesla also asserts—without contradiction by the plaintiffs—that 10 of the *Zilincik* plaintiffs who lost on the ground their claims are barred by the release contained in their separation agreements (Berlin, Brice, Epstein, Jesse, Kraft, Lim, Longhurst, Nemeth, Schloz and Schumacher) have not challenged the judgments entered against them, and so Tesla asks us to "clarify . . . that these [10] plaintiffs are not part of this appeal."  Tesla is correct that the plaintiffs' briefing contains no argument that the court erred in entering judgment against those 10 plaintiffs.  Plaintiffs' challenge to the trial court's ruling on Tesla's affirmative defense of release concerns only four other plaintiffs (Ardeleanu, Lemke, Miller, and Siwek).  By not briefing any challenge to the judgments entered against them, the other 10 plaintiffs have abandoned their appeals from the *Zilincik* judgment, and the appropriate disposition is to dismiss their appeals.  (See *Conservatorship of Ben C.* (2007) 40 Cal.4th 529, 544, fn. 8; *In re Sade C.* (1996) 13 Cal.4th 952, 994; *Drink Tank Ventures LLC v. Real Soda in Real Bottles, Ltd.* (2021) 71 Cal.App.5th 528, 537; *County of Kern v. Dillier* (1999) 69 Cal.App.4th 1412, 1425.)

Thus, on the merits, we will consider the claims of 37 plaintiffs (in their capacities as respondents and/or appellants from the judgments).

## II.

### *Legal Principles*

The principles of contractual interpretation are well-settled.  Briefly, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."  (Civ. Code, § 1636.)  In interpretating a contract,

11

"[o]ur initial inquiry is confined to the writing alone." (*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 752; Civ. Code, § 1639.) Judicial interpretation is controlled by " ' "[t]he 'clear and explicit' meaning" ' " of words, " ' "interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage.' " ' " (*Mountain Air*, at p. 752; Civ. Code, §§ 1638, 1644.) Moreover, " 'a contract must be understood with reference to the circumstances under which it was made and the matter to which it relates. (Civ. Code, § 1647).' " (*Mountain Air*, at p. 752.) " 'Extrinsic or parol evidence may be used to explain ambiguity, context or related matter.' " (*Hollingsworth v. Heavy Transport, Inc.* (2021) 66 Cal.App.5th 1157, 1177 (*Hollingsworth*).)

At the same time, California law follows the objective theory of contracts. (See 1 Witkin, Summary of Cal. Law (11th ed. 2021 update) Contracts § 767.) The parties' intent "is interpreted according to objective, rather than subjective, criteria." (*Gilkyson v. Disney Enterprises, Inc.* (2021) 66 Cal.App.5th 900, 916 (*Gilkyson*).) " ' "The parties' undisclosed intent or understanding is irrelevant to contract interpretation." ' " (*Zissler v. Saville* (2018) 29 Cal.App.5th 630, 644.) Rather, what matters are "the outward manifestations or expressions of the parties," judged by an objective standard. (*Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 150, abrogated on another ground in *Reid v. Google* (2010) 50 Cal.4th 512, 524.)

Our standard of review depends on whether the trial court resolved any factual conflicts when it interpreted the parties' agreement. " 'When the competent parol evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction [of a contract] will be upheld

12

as long as it is supported by substantial evidence.'" (*Hollingsworth*, *supra*, 66 Cal.App.5th at p. 1177.) On the other hand, when there is no conflict in the relevant extrinsic evidence, we review the interpretation of a contract de novo, both when the extrinsic evidence " 'points only one way' " such that the record shows only one "plausible interpretation" of the agreement (*Steller v. Sears, Roebuck & Co.* (2010) 189 Cal.App.4th 175, 185) and also when the undisputed extrinsic evidence is subject to conflicting *inferences* (*Gilkyson*, *supra*, 66 Cal.App.5th at p. 915).

Here, the parties do not agree on the applicable standard of review.

Plaintiffs assert our review is for substantial evidence. They assert the trial court "weighed conflicting evidence about the implications of Tesla's haphazard vesting schedules as they applied to various employees over the years and found that the pattern of permitting employees to vest before one year of employment was an indicator that [plaintiffs] had actually vested in their stock options . . . immediately upon the commencement of their employment." The portions of the record they cite do not support this assertion. The cited evidence, which concerns various employees and board members who were terminated before the expiration of one year's service, is not in conflict, and thus it does not call for a more deferential standard of review.

Tesla asserts we must review the court's ruling de novo because the trial court did not consider any of the extrinsic evidence introduced at trial, and asserts that the evidence, had it been considered, was not in conflict and supports only one reasonable interpretation of the offer letter. We do not agree the court failed to consider the extrinsic evidence. The evidence was admitted at trial; the trial court's statements of decision expressly discusses

13

some (not all) of it[12]; and, although the trial court's analysis focused primarily on the letter's plain language, Tesla points to nothing in its ruling indicating a refusal to consider any evidence. That said, we do agree with Tesla the relevant extrinsic evidence is undisputed. Accordingly, we will review the trial court's interpretation of the offer letter independently, under a de novo standard of review.

## II.

### *Analysis*

### A.    The Offer Letter's Plain Language

Once again, the disputed language of the offer letter states: "Your stock options will vest commencing upon your first day of employment (1/4th of the shares vest one year after the Vesting Commencement Date, and 1/48th of the shares vest monthly thereafter over the next three years)." Tesla argues the only reasonable interpretation is that this language encompasses a "four-year vesting schedule beginning on the employee's first day of employment with Tesla, with the first quarter of the option vesting on the employee's one-year anniversary." Plaintiffs argue this means, as the trial court ruled, that "25% of [their] stock options vested on their first day of [e]mployment." (They do not specify what, in their view, is the total length of the vesting period—which in our view is an important piece of the puzzle, for reasons we will explain.)

In our prior opinion, we held this disputed language is ambiguous. (*Vespremi v. Tesla Motors, Inc.* (May 5, 2011, A127008 [nonpub. opn.]

---

[12]  For example, in a roughly 10-page discussion, the trial court discussed evidence of the letter's drafting history, Tesla's practices regarding stock options held by employees who were terminated after less than one year of employment and other circumstances.

14

[2011 WL 1713497, at pp. *12-*14].) All of the parties assert our opinion is binding (under law of the case and/or collateral estoppel), and so we will assume without deciding that it is. We therefore begin with that prior analysis, which was based on the offer letter's plain language.[13]

In previously considering the vesting provision of the offer letter, we determined it contains a latent ambiguity "as to whether the right to purchase and hold the Tesla stock vested *before or after* the passage of one year from the effective dates of those agreements." (*Vespremi I, supra* [2011 WL 1713497, at p. *14].) We reasoned that "[t]he ambiguity arises from an apparent inconsistency between the first clause of the relevant sentence in the [offer letters] and the parenthetical clause following it: 'Your stock options will vest commencing upon your first day of employment (1/4 of the shares vest one year after the Vesting Commencement Date, and l/48 of the shares vest monthly thereafter over the next three years).' " (*Ibid.*) We found "an apparent inconsistency" in this "key" sentence, because "[t]he first clause of that sentence states that the stock options 'will vest commencing upon your first day of employment,' but the parenthetical clause following it seems contradictory in saying that '1/4 of the shares will vest one year after the Vesting Commencement Date' (the latter phrase presumably referring to the 'first day of your employment')." (*Ibid.*) "[T]he first clause of the key sentence of the [offer letter]," we said, "is inconsistent with the ensuing parenthetical clause." (*Ibid.*)

We hypothesized in our prior opinion there might be some meaningful distinction between the offer letter's use of the terms "stock options" and

---

[13] We previously granted an unopposed request to take judicial notice of our prior appellate opinions in *Vespremi.*

15

"shares" (see *Vespremi I, supra* [2011 WL 1713497, at p. *14, fn. 12]), but on appeal plaintiffs urge no such distinction. Moreover, it was plaintiffs' burden to prove their case, and nothing has been called to our attention to suggest that they adduced any evidence below, or indeed put forward even any theory, to justify a construction that distinguishes between the vesting of the right to *exercise* their stock options and the vesting of the right to *own* the shares so purchased. On the contrary, their own expert witness refuted such a distinction.[14]

Construing the vesting language, therefore, to make no distinction between the vesting of options and the vesting of shares as the case now comes to us on appeal in a new and different posture, it becomes apparent that the offer letter's plain language is reasonably susceptible, at most, to two possible interpretations concerning the vesting schedule's *duration*—a subject that, as noted, plaintiffs' appellate briefing does not address, but that we deem important to a proper construction of the disputed language as a whole. (See Civ. Code, § 1641.) On the one hand, the plain meaning of the parenthetical language plainly encompasses a *four-year* vesting period: its formula specifies that 25 percent of the options vest "one year after" the vesting commencement date, and the remaining 75 percent vest "thereafter over the next three years." "One year after" plus "three years" after that equals four years. On the other hand, plaintiffs' proffered interpretation of

---

[14] The entire premise of testimony by plaintiffs' expert about "straight line vesting" as a recognized industry alternative to vesting schedules that include a delay or "cliff" was that the former entails "an immediate delivery of . . . *vested* shares . . . ." (Italics added.) In the non-cliff scenario, he explained, "[T]he option shares will vest immediately." "[I]t creates the immediate ability to purchase shares in the company after just a month or two of service, if that's what the optionee desires."

the vesting schedule—that 25 percent of the options vest *immediately*—necessitates a construction of the parenthetical language that results in either a *three-year* vesting period (because the remaining options vest "thereafter [i.e., after day one] over the next three years") or a *four-year* vesting period that encompasses a one-year *pause* (in effect, a *delayed* one-year cliff; because the remaining options vest "one year *after*" the commencement of vesting and "thereafter over the next three years"). Both meanings are potentially problematic: the three-year vesting schedule, because it takes no account of the "one year after the vesting commencement date" language, and the four-year schedule with a *delayed* one-year cliff, because it is an interpretation not proffered by any party, and has no support in the extrinsic evidence and no apparent purpose. Finally, it also bears noting that the offer letter's plain language is *not* reasonably susceptible to an interpretation whereby one quarter of the options vest on the first day of employment *and* the remainder vest continuously over a period of four years with no one-year cliff. Mathematically, it must be one or the other (no cliff *or* four years).[15] It cannot be both. And we do not understand anyone to contend otherwise.

Having thus framed the interpretation issue in its full dimensions, we now proceed to answer it. Although this trial was lengthy and the record is voluminous, the answer, as we will explain, is not terribly complicated.

---

[15] The language "1/48 of the shares vest monthly thereafter over the next three years" results in 36/48, i.e., three-fourths vesting over a three-year period. At the end of three years, taking into account the earlier vesting of the first one fourth of the shares, there would be no remaining stock options left to vest.

At trial, the parties' experts on industry usage cleared up our confusion about the ambiguity we previously identified. Both experts—Tesla's *and* plaintiffs'—testified that the start of an option's vesting schedule is referred to in the industry as the option's "vesting commencement date." As Tesla's expert put it, that standard industry term refers to "the date on which the vesting clock begins to run" and does not imply that any portion of the option *is* actually vested as of that date. He also testified, without contradiction, that companies typically choose to start the vesting schedule for new employee stock options either on the first day of employment (which is more favorable to the employee), or the date the option is actually granted by the board of directors (which typically is some months later). Plaintiffs' expert acknowledged that a stock option that begins vesting on the first day of employment *can* be subject to a one-year vesting cliff.[16] He also admitted that an offer letter *he* drafted used the phrase "vesting commencement date" to signify that vesting began on the date the employee's service begins, even though the letter did not say that and did not define the term; he speculated that the phrase "vesting commencement date" was "most likely" defined in the corresponding grant notice.

Viewed in light of this uncontradicted evidence of industry custom and usage, it thus appears that the first clause of the disputed language in the offer letter merely specifies *when* the vesting schedule begins (i.e., "your first day of employment"), and the parenthetical (a period measured from "the Vesting Commencement Date") specifies the *duration* of the vesting period

---

[16] Asked on cross-examination about the effect of a stock option with a one-year cliff, he testified, "*if the vesting schedule begins on the first day of employment*, then there would be no shares subject to the option vested until the employee's one year anniversary." (Italics added.)

18

(i.e., four years). (See Civ. Code, § 1644 ["The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, *in which case the latter must be followed*"], italics added.) So understood, the disputed language would seem to encompass a vesting schedule that begins on an employee's first day of work, with 25 percent of the stock option vesting one year later and the remainder vesting over the course of the three years following that.

The testimony from both sides' experts about the meaning of these ambiguous technical terms strongly supports Tesla's interpretation of the disputed vesting language. But as we discuss, there is additional undisputed extrinsic evidence that supports it, and there is no evidence supporting plaintiffs' interpretation.

Before turning to the other extrinsic evidence, it is important to keep in mind the scope of plaintiffs' theory. Although there were 47 former employees involved in this trial and their individual circumstances varied (which was the subject of lengthy portions of the trial court's statements of decision), plaintiffs did not argue below and do not argue now that, at a minimum and in the alternative, the meaning of the offer letter's vesting language differs depending on specific circumstances unique to any plaintiff. Rather, their sole theory was and is that the offer letter confers identical rights on all employees. That was the theory expressly framed by their pleadings.[17] That was the theory encompassed implicitly by their closing

---

[17] The operative complaint in *Vespremi* alleged that "at all relevant times . . . , other Tesla Motors employees signed employment agreements that were similar to those signed by Plaintiffs and had the same rights to purchase stock options as Plaintiffs."

argument, which began by stressing the fact each offer letter had identical vesting language. That was the theory adopted implicitly by the trial court, which drew no distinction between any of the plaintiffs for purposes of construing the offer letter and, indeed, made findings the letter was a "standardized document used by Tesla," generated by computer. And that is plaintiffs' sole theory on appeal: they assert only that the trial court's interpretation of the offer letter is correct across the board and without distinction, and do not urge us to uphold that interpretation for any subset of plaintiffs based on their individual circumstances. Tesla, too, posits that the offer letter has the same meaning for all plaintiffs. So, we will consider the remaining extrinsic evidence in light of the parties' theory of the case: that the offer letter has a single, uniform meaning, applicable to all Tesla employees.

## B.     The Grant Notice and Stock Option Agreement

*First*, many of the plaintiffs unequivocally manifested an objective understanding that the ambiguous language of the offer letter meant there was a one-year cliff, when they received (and a majority signed) grant notices that made this explicit and did not raise any objection.[18] Nor did any other of

---

The *Zilincik* complaint alleged that each plaintiff was hired pursuant to a "substantially similar" offer letter that included an "identical" stock option vesting provision They also alleged, more generally, that "a significant number of Tesla Motors employees signed employment agreements that were substantially similar to the Zilincik Employment Agreement and included the Vesting Provision, which mandates that stock options 'will vest commencing upon your first day of employment.'"

[18]  As noted, plaintiffs say that 30 of them signed their grant notices; Tesla says the number is 35. Either way, that is considerably more than half of the plaintiffs, and an unspecified number of others also indisputably *received* grant notices.

the thousands of Tesla employees ever object that the vesting schedule of their grant notice contradicted the terms of the standard offer letter. Regardless whether the grant notices superseded the offer letters as a binding contract (which is an issue the parties have briefed but we need not decide), we agree with Tesla that the unanimous silence from the employee ranks concerning the vesting schedule information conveyed in the grant notice (over a collective period of about four years) is evidence the offer letter meant the same thing. As stated in authority plaintiffs themselves cite, "[e]vidence which tends to show a concurrence in the actual understanding of the parties is controlling." (*Canavan v. College of Osteopathic Physicians and Surgeons* (1946) 73 Cal.App.2d 511, 519; see *id.* at p. 517 [parties' subsequent correspondence "formed no part of the contract but merely served to interpret . . . it" and supported plaintiff's proffered construction, because defendant's silence "implied a concurrence" with letter received from plaintiff and "was an approval of its contents and confirmation of the agreement already reached"]; see also, e.g. *Oceanside 84, Ltd. v. Fidelity Fed. Bank* (1997) 56 Cal.App.4th 1441, 1450-1451 [borrower acquiesced in lender's interpretation of mortgage agreement by failing to object to bank's periodic notices of interest rate changes for 5 years].) "[W]hen a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court." (*Universal Sales Corp. v. California Press Manufacturing Company* (1942) 20 Cal.2d 751, 761.) "This rule of practical construction is predicated on the common sense concept that 'actions speak louder than words.'" (*Crestview Cemetery Assn. v. Dieden* (1960) 54 Cal.2d 744, 754.)

The trial court found Tesla presented the grant notices to employees as "perfunctory" corporate paperwork that simply needed to be signed and returned, with no intent by either Tesla or any of its employees to *alter* the stock option vesting provisions. But that finding in no way undermines their relevance as an interpretive aid. On the contrary, the court's finding that nobody intended by these documents to change the stock option vesting schedule cuts the other way. This necessarily suggests they all—Tesla and its employees alike—intended and understood the language of the grant notices was *consistent* with the offer letter's vesting language. What is more, the plaintiffs were not *oblivious* to the grant notices Tesla issued to them: according to the trial court's statement of decision, "Plaintiffs repeatedly testified at trial something to the effect that each saw that, consistent with his/her Offer Letter, the Grant Notice confirmed the same amount of shares exercisable under the stock option and provided the exercise price." Furthermore, "perfunctory" or not, under the law, ancillary documents provided to employees in connection with the issuance of employee stock options are relevant to ascertaining the parties' intent, as evidence of surrounding circumstances. (See *Falkowski v. Imation Corp.* (2005) 132 Cal.App.4th 499, 506, 511 [letter from CEO accompanying corporate document that granted stock options to employees held properly considered in construing meaning of corporate stock option plan]; Civ. Code, § 1647 ["A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates"].)

We also agree with Tesla that the subsequent documents are relevant as an aid to our interpretation of the offer letter for another reason: as Tesla puts it, "the documents here logically *must* be read together because the offer letter lacks certain material terms (such as the exercise price) found in the

22

Grant Notice." Tesla asserts that the stock option provision, standing alone, is judicially unenforceable. (See, e.g., *Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 811; *Peterson Development Co. v. Torrey Pines Bank* (1991) 233 Cal.App.3d 103, 115.) The parties have not cited any California authority addressing the enforceability of a stock option that lacks an exercise price, we have found none, and the question raises significant issues on this record. But regardless whether Tesla's offer letter is too uncertain on its face to be *enforced* (a question ultimately not at issue here), the undisputed evidence shows that the grant notice *in fact* supplied the missing exercise price for each of the plaintiffs' stock options. It was the vehicle by which Tesla communicated the missing price term to each plaintiff. Indeed, many plaintiffs admitted they knew the offer letter did not spell out all the details of their stock options. For example, one (Dennis Schaaf) was asked, "you understood that there were some terms of your stock option that were not set forth in your offer letter, right?" to which he answered affirmatively ("Um, yeah, I guess"). Another (Daniel Fischtein) admitted he expected there would be additional documents with "more specifics" pertaining to his promised stock option, "because it is mentioned" in the offer letter. Another (Frank Jesse) testified that he believed the grant notice and stock option agreement he signed was the "other supporting documentation" he had known would be "forthcoming" after his offer letter. We thus agree with Tesla that, logically, the grant notice is sufficiently connected to the offer letter that its contents are relevant to ascertaining the parties' contractual intent.

The parties disagree as to whether this result also is compelled by operation of law under Civil Code section 1642, which provides that "[s]everal contracts relating to the same matters, between the same parties, and made

23

as parts of substantially one transaction, are to be taken together."[19]  But we do not need to resolve whether California *law* requires us to interpret the offer letter in light of the subsequent stock option documents, because plaintiffs' expert on industry practices told the court that, *as a matter of standard industry practice*, they should be.  In substance, he testified that ambiguities in an offer letter should be resolved by consulting the corresponding stock option plan, stock option agreement and grant notice, which ideally the offer letter should incorporate by reference.[20]  "The

[19]  "Although the statute refers expressly to several 'contracts,' the language has been broadened by case law to apply to instruments or writings that are not on their own contracts.  [Citations.]  Civil Code section 1642 ' "is most frequently applied to writings executed contemporaneously, but it is likewise applicable to agreements executed by the parties at different times if the later document is in fact a part of the same transaction." ' " (*R.W.L. Enterprises v. Oldcastle, Inc.* (2017) 17 Cal.App.5th 1019, 1027.)  Moreover, the existence of an integration clause in one of the documents does not preclude application of Civil Code section 1642.  (*Id.* at p. 1031; accord, *Colaco v. Cavotec SA* (2018) 25 Cal.App.5th 1172, 1202-1203.)

[20]  The subject arose when the expert was cross-examined about a possible ambiguity in the stock option vesting language of a representative offer letter he himself had drafted:

"Q:  . . . you can read this language and your—you would expect people to understand, given the flow of it, that the one-48th shares per month don't start until the 13th month?  [Objection overruled.]

"THE WITNESS:  In these agreements there is a careful cross-referencing of the—at the end of the paragraph in B in stock option, and it says that, it will be . . . [']subject to the other terms and conditions set forth in the [Company's] 2013 equity compensation plan, and the standard form of stock agreement['], and that would include a grant notice, and that would include a statement of terms. [¶] That document and that set of agreements being integrated, *any ambiguities could be resolved in those documents*.  It is an important part of best practices to integrate the plan, because *those documents can be helpful to understanding the agreement*.

agreements tend to have a technical or an outline format," he testified, whereas "the offer letter strives to be narrative." Tesla cited this testimony but plaintiffs do not address it. Given the fact their own expert endorsed the practice of examining stock option documents to interpret an ambiguous stock option provision in an offer letter (particularly when, as here, such documents are expressly cross-referenced), we are hard-pressed to see how plaintiffs can now credibly insist that we as a reviewing court not do so.

Indeed, in closing arguments in the trial court, plaintiffs' counsel conceded this was appropriate. He argued it was permissible for Tesla to assert the later documents clarified the offer letter. We agree. That concession is binding (see *Lueras*, *supra*, 221 Cal.App.4th at p. 93 (conc. & dis. opn. of Thompson, J.); see also, e.g., *Korchemny*, *supra*, 68 Cal.App.5th at p. 1049 [concession by plaintiff's counsel during argument that he was " 'not

---

"Q. In order to be 100 percent sure, in the vesting schedule in TX 933, page 29, that the one-48th shares starts on the 13th month, we would want to look at the equity incentive plan and the stock agreement and the grant notice?

"A. *Yes*." (Italics added.)

On redirect examination, he again confirmed the need to consult plan documents to resolve uncertainty:

"Q. You mentioned that one of the best practices is to incorporate the stock option agreement in the plan, and the terms and conditions of these documents into the offer letter; is that correct?

"A. Yes, that's correct.

"Q. This is under the assumption that the vesting language in all these documents is identical and it is not different, correct?

"A. Well, yes, but the [*sic*] properly *incorporating them by reference at least allows the parties to review them together and resolve any conflicts internally*. They should all be identical, each of the vesting clauses." (Italics added.)

25

disputing the actual numbers' " held a binding admission concerning payments on promissory notes].)

## C. Other Contractual Terms

*Second*, other express terms to which some plaintiffs agreed unequivocally evince an understanding of a one-year cliff. Plaintiff Travis Lemke's offer letter not only included the disputed vesting language but also stated that if he was terminated without cause "the one-year cliff on your stock options will be waived." Plaintiffs' counsel asserted in closing argument that other Tesla employees also received offer letters waiving the one-year cliff if they were terminated without cause. Although the parties have not focused our attention on this language, it is impossible to reconcile the express reference to a "one-year cliff on your stock options" contained in some employees' letters with plaintiffs' and the trial court's interpretation of the disputed, standard vesting language contained in *all* of the letters. The words in these letters matter, and we cannot disregard them. (See Civ. Code, §§ 1639 [contractual intent must be determined "from the writing alone, if possible"], 1641 [interpretation must take into account the "whole of [the] contract . . . , so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other"].)

## D. Other Corporate Communications

Because every Tesla employee in the relevant period (not just the plaintiffs) received an offer letter containing the identical disputed language, Tesla's conduct toward its workforce in general is relevant in ascertaining the offer letter's meaning, and plaintiffs do not contend otherwise. (See *Heston v. Farmers Ins. Group* (1984) 160 Cal.App.3d 402, 407, 413, 415 [in dispute between insurer and insurance agent concerning meaning of standardized agency contract, no error to admit evidence of dealings between insurer and

other agents].)  On the contrary, plaintiffs tacitly acknowledge that evidence of Tesla's dealings with other employees is relevant because they rely on such evidence themselves (arguing that evidence of Tesla's vesting practices concerning other employees is "inarguably relevant"), and below they acknowledged the relevance of such evidence expressly.[21]

Here, quite apart from the grant notices (and, in some cases, the stock option agreements) sent to the plaintiffs, every other contemporaneous corporate communication by Tesla about the vesting period during this period consistently said, or indicated, that the new hire stock options were subject to a one-year cliff, and plaintiffs cite no evidence to the contrary.

For example, during new employee orientation sessions, which became more formalized over time as the company grew, Tesla frequently informed its employees of the one-year vesting cliff.  There was a brief period of time in which this did not happen (see footnote 22, *post,* pages 27-28), and there also was conflicting evidence as to whether the subject of stock options was always discussed in such sessions (for example, plaintiffs cite the testimony of about 18 of them who recalled no discussion of stock options when they were hired and/or in orientation sessions they attended).  But when the subject of the vesting schedule was discussed during employee orientations, the evidence was uncontradicted that Tesla apprised its new employees of the one-year cliff,[22] including in PowerPoint presentation slides prepared by

---

[21]  In closing argument, plaintiffs' counsel asserted that evidence of "practice between Tesla and its employees' work force," not just evidence of Tesla's dealings with the individual plaintiffs themselves, was relevant to the interpretation issue.

[22]  Three of the four people who served as Tesla's director of human resources during the period in question corroborated this: Craig Harding, Tesla's HR director from October 2006 to 2008, Alan Cherry, who was the

Tesla's stock administrator Lorinne Flores that were admitted into evidence.[23] Indeed, plaintiffs concede in their brief that the PowerPoint presentation was used "beginning sometime in 2009"—a binding admission. (See *Lueras*, *supra*, 221 Cal.App.4th at p. 93.) Below in closing argument, plaintiffs' counsel even tacitly conceded that some of the plaintiffs *might have seen it*.[24] The evidence also is uncontradicted that nobody ever voiced an objection that the vesting schedule described in the presentation slides differed from what had been promised in the offer letter. And the parties cite no evidence that employees were told during new hire orientation sessions that they *could* immediately exercise their options.

Contrary to the evidence just discussed (*and* the concessions in their brief and by their counsel in closing argument), plaintiffs assert that "Tesla did nothing to provide its employees with any type of training to assist [employees] in understanding of [*sic*] the stock option program." This

---

director from 2008 to approximately November 2009, and Cherry's successor, Arnnon Geshuri, who still occupied the post by the time of trial.

There was only one gap. Michael Taylor, a corporate finance executive who filled in as an interim HR director for about nine months until Cherry was hired (from around November 2007 until July 2008), recalled no employee training concerning stock options while he was temporarily overseeing Tesla's HR department.

[23] One presentation slide said, "[f]our year standard vest," and "25% vest after one year then monthly thereafter." Two others said, similarly, "[f]our year standard vest–25% vest after one year from your hire date, then monthly thereafter for the subsequent three years, as long as you remain an employee of Tesla Motors."

[24] In closing argument, he conceded the existence of the slide presentation slides and argued that 42 plaintiffs said they never saw the slides, thereby implicitly conceding the possibility that five other plaintiffs *did* see them.

mischaracterizes the record. In support, they cite testimony by only 18 of the 47 plaintiffs about the lack of training on stock options they received (Schlict, Glaudell, Kraft, Ardeleanu, Schaaf, Gerth, Jesse, Irvin, Rajaee, Siwek, Hogland, Nemeth, Huynh, Swortsfigure, McNamee, Berzunza, Webb and Minaee). Evidence that 18 people among a workforce of *thousands* could recall no such training is hardly surprising; it does not refute Tesla's showing that such training routinely took place.

In support of their assertion that "Tesla did nothing," plaintiffs also cite testimony by one of the plaintiffs, Tara Minaee, who worked in Tesla's HR department and coordinated the logistics for weekly new hire presentations for only four months (in 2010 around the time of Tesla's public offering). We discuss the details of her testimony in a footnote.[25] Minaee had no personal

---

[25] Minaee described the new hire orientation process as disorganized in that period and "always changing every week," and testified she frequently had to "run around the office" to track down presenters to cajole them to participate. As part of her duties, she assembled PowerPoint slides prepared by other people into slide decks to ensure they were arranged in order of speaker, and testified she never received any presentation slides from Tesla's stock administrator (Lorinne Flores), whom Minaee acknowledged *did* participate in the orientation sessions to discuss stock options. In all, Minaee coordinated about 12 to 14 orientation sessions. She was present during the sessions only to help new employees fill out routine paperwork and then left the room for the remainder of the sessions and was never present during Flores's presentations about stock options.

By contrast Minaee's predecessor, Tristan Acquino, corroborated the testimony of Tesla's corporate executives (see footnote 22, *ante,* page 27). Acquino coordinated the new employee orientation sessions before Minaee took that role over and, unlike Minaee, he personally attended all of the sessions he organized. He testified that Lorinne Flores presented about stock options at every session he organized and created her own PowerPoint presentations, and he authenticated the slides that she used. Acquino testified that the HR department had its own set of slides and that he was responsible for updating only those slides.

knowledge of what was discussed about stock options during those sessions in that brief period. At best, her testimony was circumstantial evidence that the person who presented on the subject (Lorinne Flores) did not always use PowerPoint presentation slides. But an equally reasonable inference, which on de novo review we are entitled to draw, is that in the chaos Minaee described, she (Minaee) was simply unaware of Flores's use of presentation slides.

Finally, plaintiffs assert that the individual "who served as Tesla's Vice President of Finance and Human Resources Director at relevant times" "admitted [that] . . . Tesla provided no training with regard to the stock option program or the Stock Option Provision to any of its employees, including Respondents, during the course of their employment." That is a particularly troubling distortion of the record. The HR executive (Michael Taylor) testified only that he recalled no employee training concerning stock options while he was temporarily overseeing Tesla's HR department. What plaintiffs do not mention is that Taylor occupied that role very early on and only briefly (from around November 2007 until July 2008) (see footnote 22, *ante*, page 28), and that o*nly seven of the 47 plaintiffs were working at Tesla during that juncture.* In short, none of the evidence cited by Plaintiffs refutes Tesla's showing that employees were often apprised of the one-year vesting cliff during new employee sessions and that nobody—ever—objected.

Tesla points to other corporate communications that consistently referred to a one-year vesting cliff as well. For example, a document entitled "Tesla Motors Stock Option FAQ" that was prepared in February 2007 referred to the one-year cliff, and the FAQ continued to be in use two years

later. [26]  In November 2007 former plaintiff David Vespremi was negotiating the terms of his departure from Tesla, and Craig Harding assured him in an email "yes options continue to vest if you switch to contractor status.  *But remember the 1 year cliff period . . . .*"  (Italics added.)  About a year later when Tesla did a round of layoffs in October 2008, its CEO Elon Musk sent a company-wide email to "everybody."  He announced the company sought to "do the right thing and be as fair as possible, given the circumstances," and so "we are making the minimum severance four weeks and *waiving the vesting cliff for those that have been here less than a year*."[27]  (Italics added.) Emails from the same period by and to a *plaintiff in this case* evinced the same understanding.[28]  And a document prepared in May 2010 called "Tesla Motors, Inc. Equity Incentive Award Grant Policy" that was sent to all

---

[26]  It stated, "Your vesting schedule spans four years, and 25% of the grant vests after the first year.  Over the subsequent three years, 75% of the options vest on a prorata basis.  Once each portion vests, you can exercise the corresponding options or sell the shares of restricted stock."

One plaintiff who worked at Tesla for two months in early 2009 (Luis Flores) acknowledged receiving this FAQ.

[27]  Seven of the plaintiffs were employed at Tesla when the email was sent and, we may infer, received it (Kraft, Ardeleanu, Berzunza, Irvin, Miller, Hofmann and Jesse).

[28]  That plaintiff (Ardeleanu) reassured a prospective customer who had read media accounts of the October 2008 layoff that "Everyone that was laid off received . . .  at least 1 year's worth of stock options *regardless if they were at the company for only one day*."  (Italics added.)  A few months later when she herself was negotiating a separation agreement with Tesla, Ardeleanu was informed by HR Director Alan Cherry that "[t]he agreement regarding *the waiver of the one year cliff vesting period* was only offered to employees that left us in the general Reduction in force in October."  (Italics added.)

employees unequivocally apprised employees of the one-year cliff, subject to Tesla's choice to deviate from it at its discretion.[29]

Tesla asserts "there is not a single document supporting the trial court's interpretation of the offer letter." Plaintiffs do not refute that assertion. And we have encountered no document refuting it either.

E. **Industry Custom and Practice Regarding New Hire Stock Options**

Tesla's interpretation of the offer letter also is consistent with the overwhelming industry standard, whereas plaintiffs' interpretation would defy the industry standard with no support in the evidence. (See *LaCount v. Henzel Phelps Constr. Co.* (1978) 79 Cal.App.3d 754, 770 ["[c]ustom and usage of words in a certain trade are admissible to explain the meaning of the terms used in a contract"].)[30]

---

[29] It stated: "The vesting schedule of equity incentive awards shall be within the discretion of the Compensation Committee (or the Board of Directors, as applicable), including establishing performance-based vesting criteria, in all cases limited by any restrictions in the Plan. *Generally, stock option awards and stock appreciation rights that vest solely based on service shall vest as to 25% of the shares subject to the award when the recipient completes 12 months of continuous service after the vesting commencement date of the stock option award and stock appreciation right and as to an additional 1/48th of the shares subject to the stock option award and stock appreciation right when the recipient completes each month of continuous service thereafter* (the 'Standard Option/SAR Vesting Schedule'). The Compensation Committee and the Board of Directors may deviate from such Standard Option/SAR Vesting Schedule." (Italics added.)

[30] Plaintiffs imply that industry practices are irrelevant, because Tesla was a maverick startup that "intended to *defy* standard industry practices—to the point of having a handbook that was entitled 'the Anti-Handbook.'" The cited evidence is a four-page employee handbook addressing the company's standards and a variety of basic subjects (such as attendance, safety, communication, outside employment and prohibited conduct), written in a blunt and irreverent style. It does not address the subject of employee

32

Both Tesla's expert and plaintiffs' expert agreed that, by far, the industry norm for stock options granted to new rank and file employees in non-executive level positions is a four-year vesting period, with a one-year cliff. Plaintiffs' expert described it as having become the "vanilla vesting schedule" for stock options, favored by companies both for operational reasons (in order to retain employees, avoid turnover and recoup the investment in hiring and training them) *and* to attract venture capital financing, because a one-year cliff is the preferred norm among private equity investors to ensure that employees are "locked in" for one year. He testified that, absent a compelling or specific reason to adopt a different vesting schedule, "it can be a default schedule for companies to rely on." According to plaintiffs' expert, companies deviate in some fashion from that typical vesting schedule in only about 10 percent of cases. He testified the deviations encompass many variations as to both the existence and length of a cliff and also the length of the vesting period, with straight-line vesting being the most common departure from the norm.[31]

Tesla does not dispute that straight-line vesting is sometimes offered, but contends the various reasons companies sometimes depart from the typical vesting formula do not apply across the board to its company-wide

compensation, much less employee stock options, and is not evidence Tesla intended to depart from industry practices regarding the vesting of new hire stock options.

[31] Regarding the vesting schedule's *duration*, plaintiffs' expert testified that companies deviate from a four-year vesting schedule "from time to time, based on the value of the employee. Employees do negotiate better deals than this, at times." Shorter periods are seen only "occasionally," he testified, citing situations involving "advisors and a few different categories" other than employees who are granted stock options in an offer letter.

stock option program. And, it asserts that offering immediate vesting to all employees would make no sense, because it would create perverse incentives for at least some employees to show up for one day's work and then immediately resign with stock options, which its expert testified is precisely what the one-year cliff is designed to avoid. We agree.

Both experts described situations in which companies sometimes deviate from the standard vesting schedule for new hires, but most of the situations depended on circumstances unique to specific recruits and were not applicable to company-wide stock option programs such as Tesla's. According to plaintiffs' expert, departures from the norm sometimes occur when a new employee is in high demand, or has a prior consulting relationship with a company. Tesla's expert opined the most frequent situation was when a company sought to induce a potential executive hire to leave behind a substantial grant of equity at their existing company. None of these individualized reasons provide a rationale for a company dispensing with the standard one-year cliff across the board for every new hire nationwide, in every single job opening, in every area of skill and at every level of experience.

Plaintiffs' expert also testified a company might deviate from the typical vesting schedule if it lacked sufficient cash "to provide other incentives, like a bonus program or signing bonus, [or] perks like cell phones, [or] computers, so they make an equity package as attractive as possible." "Depending on their success in recruiting people," he testified, "they make [the stock option package] more or less attractive" to prospective hires. Elaborating, he explained that Silicon Valley companies usually offer immediate vesting "to compensate for a lack of cash, other negatives associated with the company," or to "stand out" in a competitive market, "or

sometimes it is the entrepreneur's vision to provide equity immediately." But the parties have cited no evidence that Tesla faced such recruiting obstacles or that its founders had such a vision. On the contrary, plaintiffs' counsel conceded in closing argument that, by this period of time, Tesla was a company that "people coveted to join," and was "famous enough" to attract top talent. Tesla, he argued, *did not have an issue retaining or getting new employees, in general.*" (Italics added.) As for the company's founding "vision," the testimony of Tesla co-founder Martin Eberhard reflected no intent but to *embrace* Silicon Valley norms concerning employee stock options—including a one-year vesting cliff.[32]

There is no evidence that any company—ever—had structured a company-wide stock option program to offer new employees immediate vesting of a substantial portion of their shares on day one. Tesla's expert estimated that out of the hundreds if not thousands of situations he had encountered, he could recall no more than 30 instances in which a company had agreed to a new hire vesting schedule without a one-year vesting cliff. And only once, in a "very exceptional case" involving "very protracted" negotiations with a high-level executive, could he recall a company ever agreeing to anything comparable to allowing *25 percent of options* to vest

---

[32] Eberhard testified that when he founded the company, he asked his Silicon Valley lawyers to prepare a standard package of option documents that would enable the company to attract both employees and venture capital financing, he was aware that a one-year cliff was the standard and "so we expected something like that" in the documentation, and what he got back was a set of documents that he thought reflected a four-year vesting schedule with a one-year cliff. Eberhard also testified the documentation was prepared before Elon Musk joined the company as chairman of the board of directors.

immediately.[33] He could not recall any company adopting a vesting schedule that would permit a new rank and file employee to vest 25 percent of their options, or a large portion of them, on their first day of employment. That, he said, would be an "extraordinary" departure from the norm. Plaintiffs' expert was not asked if he had ever encountered such a generous vesting schedule for new employees, and thus did not contradict that it would be unprecedented.

In short, there is no evidence that it is consistent with industry custom and practice, or even commercially reasonable, for a company that concededly had no trouble attracting and retaining employees to implement a company-wide stock option program that would enable every single employee to show up for work on day one, and then resign on day two with an unprecedented one quarter of their stock options.

## F. Tesla's Vesting Practices

Finally, the trial court heard extensive evidence about situations in which Tesla sometimes allowed employees who left before their one-year anniversary to exercise their stock options. Tesla argues that such evidence reflects occasional exceptions that prove the existence of the one-year cliff. Plaintiffs argue substantial evidence supports the trial court's findings that Tesla had a "pattern and practice of allowing employees to either vest according to the terms of the Offer Letter or at least to exercise their stock

---

[33] In that case, he recalled, a start-up company sought to attract a chief executive who had recently been granted a very substantial stock option package by his existing employer, and ultimately agreed to vest "some portion" of the executive's options immediately and another portion after six months. He testified the situation was so unusual, it stood out in his memory.

options as though they were vested."[34]  They assert that Tesla's "pattern of permitting employees to vest before one year of employment was an indicator that [they] had actually vested in their stock options . . . immediately upon the commencement of their employment."  We agree with Tesla.

## 1. Frequency

To begin with, there was no "pattern or practice."  Plaintiffs expressly acknowledged this (once again) in closing argument.  Their counsel argued: "Tesla didn't have a uniform, consistent practice throughout the entire period that the Plaintiffs were working for Tesla" of vesting people out before one year, and he also acknowledged that "[e]veryone testified that after Tesla went public, there were *no* exceptions made."  (Italics added.)  Tesla's "practice of vesting people out in some fashion as it deemed fit in [the] circumstances," he asserted, was "arbitrar[y]" and did not reflect "a consistent practice."  Plaintiffs acknowledge the same thing on appeal, because they again characterize Tesla's conduct as "arbitrary."  At best, Tesla's conduct was either a "pattern and practice" or it was "arbitrary." Logically, it cannot be both.

The evidence indicated it was neither.  The trial court found that Tesla "would sometimes 'accelerate' vesting or extend employment (to reach 12 months of service) so that terminated employees could undisputedly exercise one year of stock options," that "[a]ccelerated exercise of stock options were granted to some high level executives" and that "[s]ometimes" Tesla extended the post-termination 30-day period in which to exercise options to facilitate the exercise of stock options by terminated employees.

---

[34]  The court made no such finding.  It made a number of specific factual findings that we will discuss as necessary.

The undisputed evidence demonstrates that Tesla made such exceptions relatively infrequently.

First, the experiences of certain high level executives do not appear to be relevant. The trial court made detailed factual findings about two company executives (Ian Wright, and Bernard Tse) and one board member (Simon Rothman) who were allowed to vest their equity after less than one year of service or employment.[35] Plaintiffs point to them, as well as the circumstances surrounding the ouster of co-founder Martin Eberhard, as examples of Tesla's vesting "pattern and practice." But the parties have not cited evidence that any of these four high-level executives/board members signed the February 2007 version of the offer letter, and so their experiences are not relevant to its meaning.[36] Moreover, Eberhard testified that the

_____

[35] Wright, the company's third employee and its first COO and the first person ever terminated by Tesla, was terminated shortly before his one-year anniversary. His separation from the company was not amicable; he signed a severance agreement and he was allowed to vest his stock purchase rights to avoid a lawsuit. Rothman was taken off the board of directors to make room for new investors and was moved to a "more or less . . . ceremonial position" on an advisory board to enable him to remain in continuous service and vest his stock options. And Tse, who had previously been on the board of directors and had approved the vesting out of Wright, later became a company executive; he was allowed to vest out his stock options when the company asked him to resign before one year, based on Wright's situation. In July 2007, he entered into a severance agreement with Tesla and the board of directors accelerated the vesting of his options.

[36] On the contrary, the trial court found Wright did *not* do so; Rothman was a board member not an employee (and thus, by definition, never received a job offer from Tesla); Tse, who joined the board in 2003, later became a company employee and was granted stock options in November 2006, his offer letter is not in the record and Eberhard could not recall what it said; and Eberhard was a co-founder whose involvement with Tesla began many years before Craig Harding drafted the February 2007 version of the offer letter (and indeed who, as noted, commissioned his lawyers to prepare the

38

Wright and Tse situations were prompted by the company's concern that some of the founding stock option documents were unclear, and so this was done to avoid potential litigation. Eberhard testified that during this period, "the general understanding [was] that if somebody was within a month or two of the vesting period of the first year of employment . . . we would just vest them out to avoid issues."[37] Of course, the offer letter was revised by Craig Harding later on (in February 2007), in an effort to clarify it. In addition, Eberhard testified Tesla did this only for people who were terminated involuntarily, not people who left the company of their own accord.

In terms of overall numbers, Tesla made exceptions to the one-year cliff for rank-and-file employees who signed the offer letter on relatively few occasions. The evidence shows it happened approximately 40 times, including in extenuating circumstances such as company layoffs (30 people) or to avert potential employment-related claims. Far more (nearly 250 people) were not permitted to do so. That is not evidence of a stock options plan with no cliff vesting. (See *Oracle Corp. v. Falotti* (N.D. Cal. 2001) 187 F.Supp.2d 1184, 1196 ["That one, or even a few, executives were allowed to vest by way of a compromise of threatened claims, or out of a desire to see an amicable separation does not amount to evidence of a policy or an admission by [corporate employer], or an abuse of discretion by the

*original* version of the offer letter at the company's founding). He received a grant of employee stock options in early 2007.

[37] The board treated Eberhard the same way when he resigned in November 2007 amid growing tension with Elon Musk; he negotiated the terms of his separation with the company (both as an employee and board member) and was put on an advisory board to enable him to continue vesting his stock options.

compensation committee in this case"] [applying California law], *aff'd,* (9th Cir. 2003) 319 F.3d 1106.)

## 2. Relevance

As Tesla argues, the exceptions it made not only were relatively infrequent, but they also contradict the trial court's interpretation of the offer letter and support Tesla's.

Tesla had a right to do this under its equity incentive plan, the terms of which the trial court found were binding. No party questions that determination on appeal.[38] The 2003 plan (§ 10 (a)) gave Tesla's board of directors the power to accelerate a stock option's vesting date "*notwithstanding the provisions in the [stock option] stating the time at which it may be first exercised or the time during which it will vest.*" (Italics added.) The 2010 plan likewise allowed Tesla at its discretion to accelerate a stock option's vesting schedule (§ 4(b)(v)), as well as extend an option's post-termination exercisability period (§ 4(b)(ix)). Indeed, plaintiffs' counsel acknowledged in closing argument that Tesla had a right to vest people out early (and simply argued Tesla lied to its employees about how frequently it did so in order to have "leverage"). Given Tesla's discretionary authority to shorten an employee's vesting schedule, evidence that over the years it occasionally allowed terminated employees who had not reached their one-year anniversary to exercise their options does not show the *offer letter* meant there was no cliff vesting. If anything, Tesla's occasional exceptions prove

---

[38] The trial court made a finding that "[t]he Offer Letter itself stated that it was subject to the operative Equity Incentive Plan, and thus the terms of the Plan were already part of the deal . . . ." Similarly, it found that "the [Equity Incentive] Plan was already part of the written employment agreement at the time of the Offer Letter." And it specifically ruled that "Tesla was bound by the terms of the Plan as to its stock options it issued."

that the general understanding was that the offer letter and stock option plan provided for cliff vesting.

Furthermore, the undisputed evidence demonstrates that when Tesla did make exceptions, it structured the arrangements in a manner consistent with the existence of a default, one-year vesting cliff. For example, plaintiffs themselves cite an email (from June 2009) asking the board of directors to *modify* the stock option vesting schedule of two employees whom Tesla intended to terminate, so that "the initial 12-month 'cliff period' (upon which 25% of the option grant is vested) [would be] replaced with a vesting schedule in which 1/48 of the option vests each month commencing with the vesting commencement date."[39] Of course, no modification of the vesting schedule would be necessary if the employees' stock options had already vested on the day they were hired. The same is true of all the examples cited by the trial court and by plaintiffs (i.e., extending people's employment so they reached one-year; moving people like Anna Yen to the status of consultant so she would remain in "continuous service" for vesting purposes[40]; and moving board members to advisory boards for the same purpose). As Tesla explains, the fact that vesting had to be modified or accelerated for some people to permit them to exercise their options without having worked for one year contradicts the trial court's interpretation. There is no need, it asserts, to modify or accelerate something that has already occurred. We agree.

---

[39] The trial court found that two of 16 people whose options were accelerated were terminated in the email's timeframe.

[40] Plaintiffs conceded in closing argument the offer letter has an implicit requirement of continuous service, which the equity incentive plan defines as rendering uninterrupted service to the company "whether as an Employee, Director or Consultant," and as not being affected by a "change in [their] capacity . . . as an Employee, Consultant or Director."

41

## G. Plaintiffs' Contrary Arguments

Plaintiffs urge us to uphold the trial court's "immediate vesting" interpretation of the offer letter on several additional grounds, none of which is persuasive.

They invoke the principle that ambiguities must be construed against the drafter, a principle to which we adverted in our prior opinion and that plaintiffs now say is law of the case. (See *Vespremi I*, *supra* [2011 WL 1713497, at p. *14]; Civ. Code, § 1654.) But, as we recognized in our prior opinion (see *Vespremi I*, *supra* [2011 WL 1713497, at p. *13], quoting *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 798-799), ambiguities are resolved against the drafter only as a last resort, if other interpretive principles do not establish the contract's meaning. It "is a general rule; it does not operate to the exclusion of all other rules of contract interpretation. It is used when none of the canons of construction succeed in dispelling the uncertainty." (*Oceanside 84, Ltd. v. Fidelity Federal Bank*, *supra*, 56 Cal.App.4th 1441, 1448 [rejecting interpretation proffered by non-drafting party in contractual dispute between bank and borrower]; accord, *Steller v. Sears, Roebuck & Co., supra,* 189 Cal.App.4th 175, 183-184.) In our prior opinion, where we noted that the disputed language " 'should be interpreted most strongly against the party who caused the uncertainty to exist,' i.e., . . . Tesla" (*Vespremi I*, *supra* [2011 WL 1713497, at p. *14]), we were considering the offer letter's meaning on appeal from the trial court's demurrer ruling and held only that the disputed language *on its face* was reasonably susceptible to plaintiffs' interpretation. Here, by contrast, we are considering its meaning after a full-scale trial on the merits. On this new and very different record, as explained above, other principles of construction *do* resolve the offer letter's meaning based upon all the undisputed extrinsic

evidence concerning industry custom and usage, the surrounding circumstances and the parties' subsequent conduct.

Plaintiffs also point to other evidence. Specifically, they cite factual findings (not challenged by Tesla on appeal) that Tesla's recruiters in its human resources department received no training on what the disputed vesting language of the offer letter meant or how to present or explain it to prospective employees; it was simply assumed they would know what to say about stock option vesting. That circumstance, in hindsight, perhaps reflects poor corporate judgment given the fact (now conceded by everyone) that the offer letter is unclear. But plaintiffs fail to explain why the lack of recruiter training is legally relevant to resolving what its ambiguous language *means*. We discern no relevance. Moreover, Tesla cites undisputed evidence that at least some recruiters did inform prospective employees about the one-year vesting cliff, including Tesla's recruiting manager (Richard Avalos) and its former director of HR, Alan Cherry.

Plaintiffs also cite the fact that one human resources employee, Sandra Giha (a plaintiff), testified she would tell prospective employees that "stock options vest starting on 'day one' " (which implies the absence of a one-year cliff, because she was unaware of one). Tesla argues that such evidence does not support the trial court's interpretation because many of the plaintiffs themselves testified that they didn't speak to anyone (including Giha) about what the offer letter meant. Indeed, only six of the other plaintiffs were hired while Giha was working at Tesla; the other 40 were hired later. Even if our review were governed by the substantial evidence standard, interpreting those 40 offer letters as providing for a right of immediate vesting based on statements made by a former Tesla recruiter with whom they never had dealings would not be a *reasonable* construction. (See *Hollingsworth*, *supra*,

43

66 Cal.App.5th at p. 1177.)  (And because plaintiffs' theory is that the offer letter has a uniform meaning, it would not be reasonable to interpret anyone else's offer letter differently.)  Moreover, the trial court found that Giha had no prior experience or knowledge about stock options and never received any training about stock options or what the offer letter meant, and plaintiffs cite no evidence she was *instructed* to tell recruits this.  The views she espoused would thus appear to be her own personal views, not views reasonably attributable to Tesla.

Furthermore, the record demonstrates Giha was simply confused in her personal views.  As we have explained above, there is no plausible construction of the disputed vesting language by which the first quarter of stock options vest immediately *and* that entails a continuous four-year vesting schedule with no one-year vesting cliff.  It must be one or the other, it cannot be both.  Yet the trial court found Giha told job applicants "*that stock options vest starting on 'day one' and continue to vest over four years*.' "  And she didn't know anything about a one-year cliff.  Plaintiffs' expert admitted on cross-examination that employees often do not understand the terms of their stock option.  He testified they "understand they have some equity in the company, *probably subject to a careful review of their company agreements*," but that in his opinion "*I don't think they always understand exactly what they have*.  But they do know, from being in [Silicon] [V]alley, and they do know from working in jobs where people have equity compensation, that under the right circumstances they will have equity, and they could enjoy a windfall, *I think that's what they are focused on*."  (Italics added.)  He testified that in his experience, "they often get the process wrong.  I think what they are focused on is that they have the opportunity for a liquidation event.  They don't always understand exactly how the nuts and

44

bolts fit together." The undisputed evidence demonstrates that this was true of Giha.

In light of all the other undisputed evidence we have discussed, Giha's remarks to some recruits does not support the trial court's interpretation of the offer letter. By far, the overwhelming undisputed evidence favors Tesla's interpretation. It is simply not reasonable to adopt an interpretation of the offer letter that is supported only by evidence that *one* Tesla employee in all the years of its corporate existence provided misinformation to *some* prospective employees, suggesting the company was offering a generous vesting schedule that not only was unprecedented in the annals of Silicon Valley but at odds with the offer letter's literal language and is contradicted by every documented formal corporate communication by Tesla executives and board members about the company's stock option vesting schedule.

## H.  Conclusion

We are not insensitive to the fact that the trial court made a number of extremely unfavorable findings reflecting Tesla's poor treatment of employees, which can be best summed up as a determination Tesla was a demanding employer that often treated people as expendable, sometimes with an insensitivity bordering on callousness. As unfortunate as that is, and as sympathetic as we might be, this case is not a referendum on Tesla's corporate employment practices. Nor is the question here whether any of the plaintiffs might have asserted a different viable claim against Tesla, such as one sounding in tort or in equity. At issue here is only a claim for breach of express contract. In reviewing the merits of that claim, we are constrained by established principles of contract interpretation. And in applying them, we simply cannot uphold an interpretation of Tesla's standard offer letter

45

that is illogical and inconsistent with virtually all of the extrinsic evidence, based on the trial court's or this court's perception of the equities.

Below in closing arguments concerning the offer letter's meaning, plaintiffs' counsel told the trial court that "[t]he record here, with all honesty, . . . it's pretty sparse from both sides." Insofar as plaintiffs' evidence is concerned, we agree. So sparse, in fact, it compels a judgment in Tesla's favor. The plaintiffs did not meet their burden to prove that the offer letter carries the meaning the trial court ascribed to it. For that reason, we conclude the trial court erred.

## III.

### *Additional Points*

Given our conclusion the plaintiffs failed to prove any breach of the offer letter, it is unnecessary to consider other issues raised by the parties. It remains only to consider two points that we deem prudent to address, on which the parties themselves have not really focused.

### A.    Travis Lemke

First, there is a contention buried in the briefing that one of the plaintiffs who lost below, plaintiff Travis Lemke, was entitled to exercise his stock options because of his unique offer letter that waived the one-year cliff if he was terminated without cause, with the *implication* in the briefing that this is what occurred.

This issue has been forfeited. It is not captioned under a separate heading in the legal argument section of plaintiffs' cross-appellants' opening brief but appears under a heading toward the end of a very lengthy (71-page) "Factual Background." Particularly in a case of this size and complexity, the omission of required separate argument headings places an undue burden on this court and allows us to deem the issue forfeited. (See *United Grand Corp.*

46

*v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153.)  Moreover, the point is not supported by any legal analysis or citation to any legal authority, which also results in forfeiture.  (See *Rubio v. CIA Wheel Group* (2021) 63 Cal.App.5th 82, 94-95; *Arnold v. Dignity Health* (2020) 53 Cal.App.5th 412, 422.)

Even if the issue were not forfeited, moreover, we would reject it.

Although the trial court made a number of findings about the circumstances of Lemke's termination, it did not make an express finding as to whether Lemke was fired for cause.  It found that Lemke was an auto technician whose job duties included doing test drives of prototypes and new Tesla cars.  About three months after he was hired, it found, Lemke was test driving a new Tesla model that was specifically slated to be delivered to Tesla co-founder Eberhard, and "was unable to complete a sudden stop in heavy traffic, and rear-ended the vehicle in front of him.  The Tesla car sustained severe front end damage, which would cost tens of thousands of dollars to repair."  He was "very shaken up," took the next two days off work at the direction of his supervisor, and then the next day he was called into Tesla's headquarters and fired.  He was told only that it was "not working out" and he was being "let go."  The court found he "crashed a very expensive car and was not surprised when he was fired shortly thereafter."  The trial court rejected Lemke's claims, both on the ground they were barred by the release in the separation agreement he signed and on the ground that he "took no steps and [made] no demands to exercise any stock options."

Because Lemke did not prevail below, the doctrine of adverse implied findings applies here.  That is, "[i]f the party challenging the statement of decision fails to bring omissions or ambiguities in it to the trial court's attention, then, under Code of Civil Procedure section 634, *the appellate court*

*will infer the trial court made implied factual findings favorable to the prevailing party on all issues necessary to support the judgment*, including the omitted or ambiguously resolved issues. [Citations.] The appellate court then reviews the implied factual findings under the substantial evidence standard." (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 59-60, italics added.) For these reasons, we will imply findings that Lemke *was* fired for cause, even though the trial court's statement of decision does not expressly resolve that issue.

That implied finding is supported by substantial evidence. Lemke's supervisor testified the car sustained about $50,000 worth of damage, the crash was Lemke's fault ("operator error"), he presented a risk, and he was terminated because of the accident (at the supervisor's recommendation), due to his "[l]ack of ability to perform the job function" including the ability to drive safely. Moreover, Lemke's termination under these circumstances was consistent with Tesla's employee handbook, which touted the company's "incredibly high standards" and goal of employing "exceptional people who enjoy pushing themselves to perform at the highest levels every day." And it warned employees, in perfunctory fashion: "If you do something stupid, depending on the circumstances you may be coached and given another chance or you may be asked to leave. We can't afford to waste our time dealing with stupid stuff when we have so many important things to get done."

For these reasons, Lemke has not demonstrated there is no substantial evidence he was fired for cause. Accordingly, he has not demonstrated any basis in the plain text of his offer letter to waive the one-year cliff.

## B.    The Awards of Costs

Finally, because we are reversing the judgments entered in favor of the prevailing plaintiffs, the prevailing party cost awards entered in their favor must also be reversed as a matter of law.  (See *Harris v. Wachovia Mortgage FSB* (2010) 185 Cal.App.4th 1018, 1027 [an "award of costs necessarily falls with the judgment"].)

## DISPOSITION

In *Vespremi v. Tesla Motors, Inc.* (Super. Ct. San Mateo County, No. 474656), the judgment entered in favor of Gene Glaudell is reversed.  The award of costs entered against Tesla is reversed and the order denying Glaudell an award of attorney fees is affirmed.

In *Zilincik v. Tesla Motors, Inc.* (Super. Ct. San Mateo County, No. 511676), the judgments entered in favor of plaintiffs Guillermo Berzunza, Ryan Christianson, John Du, Tara Flanaghan, Luis Flores, Sandra Giha, Rosalyn Gold-Onwude, Robert Hofmann, Christopher Hogland, Nha Phung (Jim) Huynh, Robert Irvin, Julija Liggins Constantino, Jennifer McCoy, Branden McNamee, Michael Schlicht, Donald Thompson and Shun Tillman are reversed, and the judgments entered in favor of Tesla and against plaintiffs Sorinne Ardeleanu, Phuong Bo, Kevin Daly, Daniel Fischtein, Robert Gerth, Christopher Hiltz, Douglas Juarez, Travis Lemke, Shirley Miller, Tara Minaee, Sheva Miran Rajaee, Dennis Schaaf, Jeremy Siwek, Chyna Stone Willman, Eric Swortsfigure, Jonathan Taylor, Michael Webb, Gary Nigel Ian Zeid and Scott Zilincik are affirmed.  The appeals by Adam Berlin, Henry Brice, Robert Epstein, Frank Jesse, Kris Kraft, Ethan Eang Lim, Tony Longhurst, Patrick Nemeth, Theodore Schloz and Frederick Schumacher are dismissed.  The award of costs entered against Tesla is

reversed and the order denying plaintiffs an award of attorney fees is affirmed.

Tesla shall recover its appellate costs in all appeals, to be paid by all parties other than those whose appeals we have dismissed.

_____
STEWART, J.

We concur.


_____
RICHMAN, Acting P.J.


_____
MAYFIELD, J.*


*Zilincik et al. v. Tesla, Inc./Glaudell v. Tesla, Inc.* (A154463, A154464, A155819, A155840)

---

\* Judge of the Mendocino County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.